[Docket No. 44]

**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW
JERSEY CAMDEN VICINAGE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>MICHAEL RAMSEUR,<br><br>　　　　　　Defendant. | Criminal No. 21-00866-1 (RMB)<br><br><br>**OPINION** |

**BUMB, Chief District Judge**

　　　This matter comes before the Court upon the Motion to Suppress Evidence by
Defendant Michael Ramseur ("Defendant"). [Docket No. 44.] Defendant argues that
on March 4, 2021, members of the Camden County Sherriff's Department SERT
Team conducted an illegal search of his residence at 209 North Willow Street,
Gloucester City, New Jersey ("Willow Street"). [Docket No. 44-2 ("Def. Br."), at 1.]
More specifically, Defendant contends the certification filed in support of the search
warrant in the Superior Court of New Jersey, Camden County, Law Division, "did
not set forth sufficient information to establish probable cause," such that the
statement made by Defendant after the search of his home "must be suppressed as
the fruit of the poisonous tree" since "[t]he good faith exception to the exclusionary
rule. . . does not apply." [Def. Br. at 12.] The Government opposes the motion,
arguing that the certification sets forth "ample probable cause," such that "the search

warrant was properly issued and all items recovered from the property are admissible," as well as Defendant's post-*Miranda* confession. [Docket No. 46 ("Govt. Br."), at 1.] For the reasons set forth below, Defendant's motion shall be **DENIED**.

## I.    FACTUAL BACKGROUND

For purposes of this Opinion, the Court relies upon the factual information set forth in the application for search warrant and supporting declaration by Detective Matthew DiDomenico, which both parties appended to their briefs. [Docket No. 44-4; Docket No. 46-1 ("DiDomenico Cert." or "Certification").] The Certification states that law enforcement began investigating Defendant and his co-defendant, Robert Darby ("Darby"), in September 2020 after a confidential source provided information to Detective DiDomenico that Darby was selling bulk quantities of ecstasy pills and marijuana in Camden County. [DiDomenico Cert. ¶ 8.] Law enforcement then executed several controlled buys of controlled substances from Darby through this confidential source ("CS-1") and another confidential source ("CS-2").

Between the weeks of October 4, 2020, and November 1, 2020, law enforcement worked with CS-1 to purchase ecstasy pills from Darby on four separate occasions, during which Darby's residence at 98 Oak Street, Unit 4212, Lindenwold, New Jersey ("Oak Street") was confirmed after surveillance units observed Darby's vehicle parked nearby on multiple occasions. [*Id.* ¶¶ 16–17.] During the second, third, and fourth controlled buys of ecstasy pills from Darby, law enforcement observed Darby leaving Oak Street, driving to the meet location established with CS-

2

1, meeting with CS-1 in one of their vehicles, and driving directly back to Oak Street. [*Id.* ¶¶ 17–18, 22–23, 26–27.]

During the investigation, law enforcement determined that Darby was a close associate of Defendant based on information from CS-1 and from another confidential informant who had previously cooperated with law enforcement. [*Id.* ¶ 31.] Both confidential sources also informed law enforcement that Defendant owns and supplies an open-air heroin drug set in Camden. [*Id.*] Detective DiDomenico stated in his sworn Certification that such information was confirmed by continued surveillance of Darby who traveled to Defendant's Willow Street residence approximately once weekly during the initial investigation between the weeks of October 4, 2020, and November 1, 2020, through a GPS tracker that had been affixed to Darby's vehicles pursuant to a state court order, which is not at issue here. [*Id.*] The Certification also notes that Defendant had thirteen (13) felony convictions involving controlled dangerous substances, weapons offenses, resisting arrest, criminal mischief, and burglary from 1992 through 2019. [*Id.*]

During the week of December 20, 2020, law enforcement directed CS-1 to inquire with Darby about purchasing fentanyl. [*Id.* ¶ 32.]  Darby told CS-1 he did not have fentanyl but could obtain it from someone else. [*Id.*] That week, CS-1 purchased fentanyl from Darby at a prearranged location, but officers were unable to follow Darby leaving the meet location following the controlled buy due to limited manpower. [*Id.* ¶ 34.] Between the weeks of December 27, 2020, and February 21, 2021, CS-1 conducted five (5) controlled purchases of fentanyl from Darby,

3

summarized below, which the Government contends establishes probable cause that

Defendant was supplying Darby with fentanyl:

**Week of December 27, 2020** [DiDomenico Cert. ¶¶ 37–39, 42]:  CS-1 called Darby to arrange a second controlled purchase of fentanyl, establishing a meet time and location. Since law enforcement thought Defendant could be a possible source of supply, added surveillance units were positioned near his residence at Willow Street. Surveillance units observed Darby leave his residence at Oak Street and enter his vehicle, and then followed Darby to Camden. The surveillance units positioned near Willow Street observed Defendant leave his home and enter his vehicle, but due to Defendant's driving at a high speed, an attempted follow by law enforcement was unsuccessful. However, within minutes of losing sight of Defendant, Darby was observed driving to the White Horse Pike in the "Speedy Mart" parking lot. Defendant parked directly next to Darby less than a minute later. The men exited their vehicles and interacted outside. Shortly thereafter, Darby got back into his vehicle and drove away. Darby then drove back toward the meet location he and CS-1 had established, and drove directly there without making any stops. CS-1 arrived at the meet location and entered Darby's vehicle, remaining there for approximately five (5) minutes. Darby was then observed proceeding back to White Horse Pike where Defendant had remained parked and inside his vehicle. Darby parked adjacent to Defendant and the two men exited their vehicles and began interacting on the sidewalk. Law enforcement terminated the surveillance at this time. After this surveillance, law enforcement applied for, and the Honorable Christine Orlando approved, the installation of GPS trackers on Darby and Defendant's vehicles.

**Week of January 17, 2021** [DiDomenico Cert. ¶¶ 45–47]:  CS-1 and Darby set up another controlled buy of fentanyl via telephone, during which Darby told CS-1 he had to drive across the Betsy Ross Bridge into Pennsylvania to get the drugs. Surveillance units at Darby's Oak Street home observed Darby leave around 10:00AM and proceed along the route he had described to CS-1 driving to Northeast Philadelphia. Darby then drove back into New Jersey and by passed the meet location established with CS-1. Officers instructed CS-1 to call Darby and let him know they were at the meet location. Darby told CS-1 on that call that he still did not have the product and still had to meet with the individual who did. Surveillance units continued to follow Darby who drove to Defendant's Willow Street residence, at which point he went inside through the front door and remained inside for approximately thirty (30) minutes. Officers instructed CS-1 to place another call to Darby for an update on when they would be meeting. During this conversation, Darby changed the meet location and stated he would be there in five (5) minutes.

Darby and Defendant then both exited Willow Street, got into Darby's vehicle, and drove directly to the new meet location. Darby entered CS-1's vehicle for approximately five (5) minutes before getting back into his vehicle and leaving the area.

**Week of January 24, 2021** [DiDomenico Cert. ¶¶ 50–54]:  CS-1 contacted Darby for another controlled buy of fentanyl, and during the conversation a quantity was established. Darby told CS-1 he needed to get it from "his peoples." Officers observed that both of Darby's and Defendant's vehicles were in Camden when CS-1 placed the call. Defendant was then observed arriving at his Willow Street residence and proceeding inside. CS-1 contacted Darby agaisnt thirty (30) minutes after Defendant arrived home, and Darby stated he was on his way to "grab it." Darby then arrived in the Willow Street area, parked, and entered the building through the front door. CS-1 called Darby again thirty (30) minutes later advising Darby they were ready to meet. Minutes later, Darby exited Willow Street and drove to the meet location, making no stops nor contacting any other persons since leaving Willow Street. CS-1 entered Darby's vehicle once at the meet location and the controlled buy was executed.

**Week of February 14, 2021** [DiDomenico Cert. ¶¶ 59–65]:  Law enforcement met with a separate confidential informant, CS-2, who contacted Darby via text message about meeting in person to discuss a controlled purchase. The two met in Camden, and CS-2 got out of his car and entered the Darby's vehicle for approximately fifteen (15) minutes. Almost simultaneous with the meet concluding, Defendant arrived; Darby entered Defendant's vehicle for a short amount of time. When Darby exited, surveillance units followed him back to his residence at Oak Street, as well as followed Defendant back to his residence on Willow Street. CS-2 told law enforcement that while he was meeting with Darby to discuss prices of fentanyl per gram, Darby received a Facetime call from "his peoples," who CS-2 later identified as Defendant. Darby elaborated that "his peoples" were coming to drop off 50 grams, which Darby was intending to sell to someone else. CS-2 then asked if they could purchase 100 grams that same day. Darby confirmed but said he had to get it from "his peoples," but that should take less than an hour to procure. After more than an hour, CS-2 texted Darby for an update. Darby had remained at his Oak Street residence this whole time and responded with a meet location in Lindenwold. Darby was observed leaving Oak Street and proceeding directly to the meet location without making any stops. CS-2 and Darby interacted for approximately one (1) minute while the controlled purchase took place. Law enforcement believes Defendant dropped off a quantity of fentanyl to Darby, and Darby then took the fentanyl to his Oak Street residence, mixed it with cutting agents, and prepared it to be sold to CS-2.

**Week of February 21, 2021** [DiDomenico Cert. ¶¶ 66–69]:  Law enforcement directed CS-1 to contact Darby for another controlled purchase. Darby let CS-1 know that he had the fentanyl on hand, and a meet location was established. Darby left his Oak Street home and proceeded directly to the meet location where CS-1 and Darby interacted inside Darby's vehicle for approximately fifteen (15) minutes while the sale took place. Afterwards, Darby drove directly back to Oak Street.

For each of the above controlled buys of fentanyl, Detective DiDomenico confirmed in his sworn Certification that CS-1 and CS-2 remained under constant surveillance, had contact with no other persons that could have provided them with fentanyl, were given a certain amount of U.S. currency by law enforcement to purchase the fentanyl, and thus, were credible sources. Testing by the FBI later confirmed that the substances from each of these controlled purchases between the weeks of December 27, 2020, and February 21, 2021, were positive for fentanyl.

## II.   LEGAL STANDARD

"A search warrant is valid if supported by probable cause that particular contraband or evidence will be found in a particular place." *United States v. Chambers*, 597 F. App'x 707, 710 (3d Cir. 2015) (citing *United States v. Golson*, 743 F.3d 44, 53 (3d Cir.2014)). However, the warrant must be upheld by a reviewing court "as long as there is a substantial basis for a fair probability that evidence will be found." *Id.* (citing *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir.1993)). Further, the Third Circuit has made clear that "direct evidence linking the place to be search to the crime is not required for the issuance of a search warrant." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (citing *Conley*, 4 F.3d at 1207). Instead, probable cause may be inferred "by considering the type of crime, the nature of the items sought, the

suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime." *Id.* (citations and quotations omitted).

The U.S. Supreme Court has long-recognized that probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Thus, the task before the magistrate judge issuing a search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 214. The role of the reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.*

There is no requirement that criminal activity occur inside a property for there to be probable cause to search the property. Although "probable cause to arrest does not automatically provide probable cause to search the defendant's home, the fact that probable cause to arrest has been established increases the probability that the defendant is storing evidence of that crime in the defendant's residence." *United States v. Whitner*, 219 F.3d 289, 297 (3d Cir. 2000). The Third Circuit also expressly recognized in agreement with several other Circuits that a reasonable inference may often be drawn that drugs may be stored in a defendant-drug dealer's residence:

> The rationale underlying the foregoing line of cases is that evidence associated with drug dealing needs to be stored somewhere, and that a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large

7

amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

[*Id.*] In *United States v. Burton*, the Third Circuit clarified that even though "it is a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences," application of such inference requires "evidence supporting three preliminary premises:  (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." 288 F.3d 91, 104 (3d Cir. 2002).

## III.  ANALYSIS

Having reviewed the contents of Detective DiDomenico's Certification and application for a search warrant of Defendant's Willow Street residence, the Court is satisfied there was a substantial basis that contraband or evidence of fentanyl dealing by Defendant would be found, confirmed through his supply of fentanyl to Darby, who in turn sold fentanyl to the Government's confidential sources. This Court finds it was a reasonable inference that such evidence would be found in Defendant's Willow Street residence, and in reaching this conclusion, considers each of the *Burton* factors below.

### A.  The Certification Sets forth Evidence that Defendant is Actually a Drug Dealer

First, the Court finds that there was sufficient evidence to support the preliminary premise that Defendant was actually a drug dealer in the Certification. The Certification plainly states that law enforcement received not one, but two tips

8

from confidential sources (one of whom was a trusted source that had not only cooperated with the Government in the past, but also provided Defendant's telephone number to officers). [DiDomenico Cert. ¶ 31.] The Certification also details Defendant's long criminal history, including nine (9) felony convictions for offenses involving controlled substances, including for the distribution of heroin, cocaine, and other/unspecified controlled dangerous substances, conspiracy to distribute heroin (the most recent offense listed from 2019), as well as two separate felony offenses for having controlled dangerous substances on school property. [*Id.*]

Turning to the evidence set forth in the Certification regarding law enforcement's actual surveillance of Defendant, there can be little doubt that the search warrant application was supported by ample probable cause that Defendant was a drug dealer, more specifically, by supplying fentanyl to Darby for distribution in the community. The Court notes that Defendant does not challenge the basis for the orders approving the installation of GPS trackers on his vehicles. [*Id.* ¶ 30.] As set forth in the Certification, the first controlled buy of fentanyl involving Defendant occurred during the week of December 27, 2020, when law enforcement added surveillance after continued observation of Darby, a known ecstasy dealer, was going to Defendant's Willow Street residence on a weekly basis. [*Id.* ¶ 37.] Officers then observed Defendant meet with Darby just before a controlled buy of fentanyl by CS-1. [*Id.* ¶¶ 38–39.]

Detective DiDomenico's Certification also highlights Defendant's involvement in the controlled buy of fentanyl that occurred during the week of

January 17, 2021. Immediately after Darby told CS-1 that he was picking up fentanyl from the individual who had it, Darby drove to and entered the front door of Defendant's Willow Street residence, where he remained for thirty (30) minutes before both Darby and Defendant drove together to the established meet location (without making any stops or having contact with anyone else along the way) where Darby sold fentanyl to CS-1. [*Id.* ¶ 46.] The Certification states a similar chain of events occurred the week of January 24, 2021, where Darby confirmed to CS-1 that he was going to pick up fentanyl from his supplier, arrived at Defendant's Willow Street residence, and upon leaving was then ready to meet CS-1 to sell fentanyl. [*Id.* ¶ 50.] The evidence that Darby was meeting with Defendant to obtain fentanyl to sell to the Government's confidential sources is supported by probable cause. There was also probable cause for the conclusion that there would be evidence of fentanyl dealing at the Willow Street residence based the law enforcement's observations, confirmed through its confidential sources, that was where Darby was going to obtain it.

Finally, the Certification details the controlled buy of fentanyl by CS-2 from Darby the week of February 14, 2021. While CS-2 was meeting with Darby to discuss the price of fentanyl, Darby received a Facetime call (later confirmed to be from Defendant) where Darby was informed about a fentanyl drop off later that same day. [*Id.* ¶ 61.] In essence, the detailed descriptions of controlled buys in the Certification establishes not only that there was probable cause that Defendant was a

drug dealer supplying fentanyl to Darby, but also that there was probable cause to believe Defendant was supplying Darby with fentanyl at Willow Street.

**B.   Willow Street was Defendant's Residence**

Defendant does not dispute that his permanent residence was at his Willow Street apartment. Further, the Certification sets for ample information that law enforcement reasonably concluded Willow Steet was Defendant's home after observing his comings and goings from the residence, as well as his vehicles regularly being parked outside. [*Id.* ¶ 31.] Thus, the Court finds that the second *Burton* is satisfied.

**C.   The Certification Established Probable Cause that Willow Street Contained Contraband Linking Defendant's Drug Dealing Activities**

As discussed above, *supra* III.A., the Certification includes evidence of at least two separate occasions where Darby told a confidential source he was going to obtain fentanyl, went to Defendant's Willow Street residence, and then sold fentanyl to the confidential source during the weeks of January 17 and 24, 2021. [DiDomenico Cert. ¶¶ 46, 50–56.] During the week of January 17, 2021, Defendant even accompanied Darby to the established meet location where the controlled buy of fentanyl by the Government's confidential source was executed. [*Id.* ¶ 46.] The Court finds either instance constitutes sufficient evidence in the Certification that there was probable cause evidence or contraband linking Defendant's drug dealing activities would be found at his Willow Street residence. Further, the Certification specifically sets forth the types of contraband suspected to be discovered at Willow

Street, as well as notes that Defendant barricaded doors flushed controlled dangerous substances down a toilet during a takedown of a wiretap investigation in 2019. [*Id.* ¶¶ 71, 73.] Defendant's arguments that the Certification "concerned conduct that occurred on the street" and that "neither confidential source in this case ever entered the [D]efendant's home" are unavailing in light of the ample evidence set forth in the Certification that all three *Burton* factors were clearly satisfied. [Def. Br. at 15, 17.]

### D.   Evidence Obtained from Defendant's Willow Street Residence are Also Admissible Under the Good Faith Exception

Even if there was not a substantial basis for the magistrate judge's finding that probable cause existed for the search warrant of Defendant's Willow Street address, the Court agrees with the Government that the evidence obtained in this case would still be admissible under the good faith exception to the exclusionary rule. The good faith exception instructs against the suppression of evidence "when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (quoting *United States v. Williams*, 3 F.3d 69, 74 (1993)). "The test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization." *Id.* (citation omitted).

The Third Circuit has identified four situations where the an officers reliance would not trigger the exception:  (1) when the issuing judge "issued the warrant in reliance on a deliberately or recklessly false affidavit"; (2) when the issuing judge "abandoned his judicial role and failed to perform his neutral and detached

function"; (3) when the search warrant is based on a certification "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the search warrant "was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *Id.* at 308 (citing *Williams*, 3 F.3d at 74 n. 4). Here, the Court finds that there is no evidence that any of these four situations are applicable. The Court rejects Defendant's conclusory argument that the Certification fell "far short" of a "colorable showing" of probable cause. [Def. Br. at 22–23.] Law enforcement's reliance upon the search warrant was reasonable and Defendant's remaining argument that his post-*Miranda* confession must be excluded as the fruit of the poisonous tree is also unavailing.

## IV.  CONCLUSION

For the reasons stated herein, Defendant's Motion to Suppress Evidence [Docket No. 44] shall be **DENIED**. An accompanying Order of today's date shall issue.

<u>August 16, 2023</u>                                        <u>s/Renée Marie Bumb</u>
Date                                                              Renée Marie Bumb
                                                                  Chief District Judge